# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Russell Naylor and<br>Suzanne Naylor, h/w | : | |
| | : | |
| v. | : | No. 659 C.D. 2018 |
| | : | |
| Board of Supervisors of<br>Charlestown Township and French<br>and Pickering Creeks Conservation<br>Trust, Inc. | : | |
| | : | |
| Appeal of: Board of Supervisors of<br>Charlestown Township | : | |
| | : | |
| Russell Naylor and Suzanne<br>Naylor, h/w | : | |
| | : | |
| v. | : | No. 707 C.D. 2018 |
| | : | Argued: November 13, 2019 |
| Board of Supervisors of<br>Charlestown Township and French<br>and Pickering Creeks Conservation<br>Trust, Inc. | : | |
| | : | |
| Appeal of: French and Pickering<br>Creeks Conservation Trust, Inc. | : | |

BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge[1]
                  HONORABLE RENÉE COHN JUBELIRER, Judge
                  HONORABLE PATRICIA A. McCULLOUGH, Judge
                  HONORABLE ANNE E. COVEY, Judge
                  HONORABLE MICHAEL H. WOJCIK, Judge
                  HONORABLE CHRISTINE FIZZANO CANNON, Judge
                  HONORABLE ELLEN CEISLER, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE WOJCIK                               FILED: January 7, 2021

---

[1] The decision in this case was reached before January 4, 2021, when President Judge Leavitt served as President Judge.

In these consolidated appeals, the Board of Supervisors of Charlestown Township (Township) and French and Pickering Creeks Conservation Trust, Inc. (Trust) appeal the judgment entered by the Court of Common Pleas of Chester County (trial court) in favor of husband and wife Russell and Suzanne Naylor (collectively, Naylors) and against the Township and the Trust. The Township and the Trust assert procedural and substantive errors of law. After careful consideration, we affirm.

## I. Background

The Naylors commenced this action in October 2014 by filing a single-count complaint (Complaint) seeking a declaratory judgment under the Declaratory Judgments Act (DJA)[2] that would permit them to build a single-family dwelling on their property. The subject property is located at 2445 Charlestown Road, Malvern, Chester County (Property), and was once part of a larger tract known as the Baughman Farm. The following is a summary of the protracted history and relevant facts.

The Baughman Farm is situated in the scenic Pickering Creek Valley and is part of the Charlestown National Historic District.[3] In August 1986, Arnold Bartschi, then owner of the Baughman Farm, placed his farm into a conservation easement, titled "Open Space Easement in Gross in Perpetuity and Declaration of

---

[2] 42 Pa. C.S. §§7531-7541.

[3] The Baughman Farm is bounded by Charlestown Road to the east, Pickering Creek to the south, a Pickering Creek tributary to the west, and Pickering Road to the north. Trial Court Op., 1/12/18, at 3.

2

Restrictive Covenants" (Easement), with the Trust.[4] At the time, the Baughman Farm was comprised of three tax parcels: Chester County Tax Parcel (CCTP) Nos. 35-2-8, 35-2-73 and 35-2-74. The Easement expressed the desire to preserve, conserve and protect the Baughman Farm and its agricultural, historic, scenic and relatively natural state. The Easement noted the presence of a historic water-powered mill (Mill) and a dwelling house of Victorian architecture (Victorian House).[5] It prohibited the construction of new or additional buildings or structures unless necessary for agricultural purposes. In exchange for entering into the Easement, the Trust paid Bartschi nominal consideration ($1). Trial Court Op., 7/19/16, at 2; *see* Easement at 1-21; Reproduced Record (R.R.) at 126a-29a, 1298a-1318a.

Shortly after entering into the Easement, the Victorian House was destroyed by fire and was never reconstructed. Its ruins were bulldozed and grass was planted on the site. Over time, the location of the Victorian House became obscured. Trial Court Op., 7/19/16, at 2.

After the Victorian House was destroyed, William and Elizabeth Anderson (Andersons) expressed interest in purchasing the Baughman Farm contingent on their ability to erect two dwellings – a main residence, in which they intended to live, and a tenant house, in which their parents would live. When the Trust objected, Bartschi filed a declaratory judgment action against the Trust to permit the construction of the two dwellings on the property. The trial court,

---

[4] The Easement was duly recorded with the Chester County Recorder of Deeds in Deed Book 419, Page 378. Trial Court Op., 7/19/16, at 2.

[5] At the time the Easement was entered, a dilapidated barn also existed on the Baughman Farm, but it was not identified in the Easement. Trial Court Op., 7/19/16, at 14.

3

presided over by the late Honorable Leonard Sugerman, held a bench trial and then issued a decision on October 31, 1991 (Sugerman Decision). Sugerman Decision at 1-15; R.R. at 285a-99a. Judge Sugerman noted that the Trust had agreed that the Easement permitted the erection of a single principal dwelling to replace the Victorian House destroyed by fire. Sugerman Decision at 5-6; R.R. at 289a-90a. Therefore, Judge Sugerman focused on the issue of whether a *second* dwelling was permitted. Judge Sugerman determined that "the Easement clearly prohibits the construction of two residential dwellings on the Baughman [Farm]." Sugerman Decision at 10; R.R. at 294a. In reaching this decision, Judge Sugerman relied on the Easement's language prohibiting "new or additional buildings or structures" unless "necessary for agricultural purposes." Sugerman Decision at 10-11 (quoting the Easement at 11, 14; R.R. at 1307a, 1310a); R.R. at 294a-95a. Although Mrs. Anderson referred to the second dwelling as a "tenant house," "tenant farmhouse," and "tenant farm dwelling," she testified that she intended to use the second dwelling for her family – initially to house her father-in-law, an obstetrician approaching retirement. Sugerman Decision at 11-12; R.R. at 295a-96a. Judge Sugerman found that the "second dwelling as envisioned by Mrs. Anderson" did not support the position that it was "'necessary for agricultural purposes,' either in the context of the Easement or in the light of Mrs. Anderson's proposals." Sugerman Decision at 12 (quoting Easement at 14; R.R. at 1311); R.R. at 296a. "[A] retired obstetrician is an unlikely candidate for the position of 'tenant farmer.'" Sugerman Decision at 13; R.R. at 297a. Thus, Judge Sugerman concluded "that a second dwelling may not be erected on the Baughman [Farm]." Sugerman Decision at 14; R.R. at 298a. Notably, Judge Sugerman was not tasked with determining, and hence did not determine, whether the permitted principal dwelling must be erected at the exact location of and

4

in the same architectural style as the Victorian House. Sugerman Decision at 14 n.5; R.R. at 298a; *see* Trial Court Op., 7/19/16, at 2-3.

Because the Andersons' contingency regarding the second dwelling was not met, they did not move forward with the purchase of the Baughman Farm. In December 1991, two months after the Sugerman Decision, Bartschi conveyed the Baughman Farm to the Bartschi Foundation (Foundation) in fee. Trial Court Op., 7/19/16, at 3.

A decade later, the Township asked the Foundation to restore the Mill, which was in ruins. The Foundation lacked funding to restore the Mill and, consequently, applied for a demolition permit instead. The Charlestown Township Historical and Architectural Review Board held hearings on the permit application. Trial Court Op., 7/19/16, at 3.

Following these proceedings, the Foundation and Township agreed to subdivide the Mill from the Baughman Farm and transfer this parcel to the Township for nominal consideration ($10) for purposes of restoring the Mill. The agreement permitted the restoration of the Mill, but prohibited the construction of any new structures. R.R. at 58a-60a. The Township's engineer prepared a subdivision plan, which the Township approved in July 2002. The subdivision plan divided CCTP No. 35-2-74 into two parcels: (1) CCTP No. 35-2-74, which contained 35.5 acres of land, and (2) CCTP No. 35-2-74.2, which contained 1.629 acres of land and the Mill (Mill Lot). On July 30, 2002, the Foundation conveyed the Mill Lot to the Township. Thereafter, the Township restored the Mill. Trial Court Op., 7/19/16, at 3-4.

In 2004, the Foundation approached the Naylors, who own an adjoining parcel, about purchasing the remainder of the Baughman Farm (41.60 acres), *i.e.*,

5

the Property.[6]  *See* R.R. at 599a.  The Naylors were interested, but only if they could build a principal dwelling on the Property.  To that end, the Naylors and the Trust engaged in discussions.  At some point, the Township became involved in these discussions and developed a list of concessions that it desired in exchange for its cooperation with the sale.  Mr. Naylor withdrew from these conversations, stating "the restrictions/demands that the [T]ownship is placing on me are too severe for me to keep open my offer to acquire this [P]roperty from the Trust."  Trial Court Op., 7/19/16, at 4 (quoting Kuhn Transcript, Ex. P-10 (1/10/05 email from Mr. Naylor to Supervisor Kuhn)); *see* R.R. at 428a.

In 2005, the Foundation and the Naylors reopened their negotiations and reached an agreement for the Naylors to purchase the Property for $874,000.[7] On December 14, 2005, the Foundation and the Naylors entered an agreement of sale and an addendum.  Therein, the Foundation agreed to cooperate in negotiations with the Trust relating to the construction of a dwelling on the Property.  Trial Court Op., 7/19/16, at 4.

On January 27, 2006, the Foundation conveyed the Property to the Naylors.  The Trust and the Naylors engaged in discussions about restructuring the Easement.  The Naylors' attorney, Timothy Barnard, Esq. (Naylor Attorney), sent the Trust a memorandum, dated July 30, 2011 and revised August 8, 2011, regarding restructuring the Easement (Naylor Memorandum).  R.R. at 474a-75a.   The

---

[6] To be clear, when we refer to the Baughman Farm, we are referring to the entire tract as it existed when the Easement was created; when we refer to the Property, we are referring to the remainder of the Baughman Farm (CCTP 35-2-8, 35-2-73 and 35-2-74, less the Mill Lot/CCTP 35-2-74.2), which is currently owned by the Naylors.

[7] *See* Trial Court Op., 7/19/16, at 5.  The trial court stated the purchase price was $874,000, but the record supports a purchase price of $875,000.  *See* R.R. at 66a; 793a.

Memorandum set forth certain items for clarification, including the identification of two alternate sites on the Property to locate the dwelling. The Naylor Memorandum confirmed that: "Two house sites have been identified and will be recorded on the conservation plan as <u>alternate</u> permitted locations for the <u>one</u> re-built primary residence." Trial Court Op., 7/19/16, at 4-5 (quoting the Naylor Memorandum, ¶5 (emphasis in original)); *see* R.R. at 475a.

In response, the Trust prepared a "Conservation Easement Preparation and Processing Agreement" (Processing Agreement), which the Naylors and the Trust signed in September 2011. The Processing Agreement provided that the structure and content of the Easement would track the Naylor Memorandum. Pursuant to the terms of the Processing Agreement, the Naylors agreed to pay the cost of updating the Easement and, to that end, the Naylors submitted a $5,000 retainer, which the Trust accepted. Trial Court Op., 7/19/16, at 5.

In early October 2011, Township Supervisor Kevin Kuhn (Township Supervisor) learned of the Processing Agreement and immediately notified the Trust of the Township's dissatisfaction with the agreement, particularly with the Trust's willingness to permit the Naylors to build a dwelling on the Property. Discussions among all of the parties ensued. Trial Court Op., 7/19/16, at 5.

By letter dated January 30, 2012, counsel for the Township, Mark Thompson, Esq. (Township Solicitor), informed Naylor Attorney that the Easement did not permit a dwelling to be constructed in the existing pasture or agricultural fields of the Property. Township Solicitor expressed his belief that the location of the Victorian House is the only area contemplated for a residential building on the Property. Trial Court Op., 7/19/16, at 5; *see* R.R. at 137a.

In February 2012, the Foundation recorded a "Deed of Correction" for the Property, purporting to convey to the Naylors "all and singular rights to rebuild the historic residence formerly located on the Grantor's property known as the Baughman Farm (which residence was destroyed by fire) at such location as which Grantee might be entitled, or Grantee and [the Trust] may otherwise agree . . . ." Trial Court Op., 7/19/16, at 5 (quoting Deed of Correction at 4); *see* R.R. at 100a.

By email dated June 13, 2012, counsel for the Trust, George Elser, Esq. (Trust Attorney), responded to Naylor Attorney's questions. Trust Attorney advised that "the Trust agreed that a house may be rebuilt and that there is no express limitation on where the house may be built, although its location and structure must be consistent with the conservation values expressed throughout the Easement." Trial Court Op., 7/19/16, at 5-6; *see* R.R. at 351a. "Trust Attorney further expressed that the Trust wished to assist the Naylors and the Township in resolving their differences regarding ownership of the building right." Trial Court Op., 7/19/16, at 6; *see* R.R. at 351a. He communicated the same to Naylor Attorney and Township Solicitor by letter dated June 14, 2012. Trial Court Op., 7/19/16, at 6; *see* R.R. at 351a.

"The Township quickly communicated its objection to the Trust's position of neutrality and urged the Trust to enforce the Easement by refusing the Naylors permission to build." Trial Court Op., 7/19/16, at 6. When the Trust failed to adopt the Township's position, Township Supervisor threatened to bring legal action against the Trust to enforce the Easement. *Id.*

By letter dated September 8, 2012, Trust Attorney informed Naylor Attorney that the Trust had reconsidered its position. As holder of the Easement, the Trust determined that it held the responsibility to interpret the Easement and

8

concluded that the Easement did not permit the Naylors to build a house on the Property. Trial Court Op., 7/19/16, at 6; *see* R.R. at 107a.

In October 2014, the Naylors instituted this action by filing a Complaint seeking a declaratory judgment against the Township and the Trust to secure the right to build a single-family dwelling (Replacement House) on the Property with the trial court. Therein, the Naylors asked the trial court to make the following declarations: (1) the "Easement allows the construction of the Replacement House in another location on the Property," *i.e.*, at a site other than that of the original Victorian House; (2) the Foundation "conveyed the right to construct the Replacement House to the Naylors"; (3) "the Naylors have the right to construct the Replacement House on the . . . Property"; (4) the Easement does not require the Trust's or the Township's "approval of the location of the Replacement House"; (5) "construction of the Replacement House on the . . . Property is subject only to the applicable requirements of the Township's Zoning Ordinance and Building Code"; and (6) "the Township's only role is to administratively review and process the Naylors' building permit application for the Replacement House." Naylors' Complaint at 12-13; R.R. at 25a-26a. In addition, the Naylors sought to "[e]njoin the Township from taking any actions to interfere with the Naylors' construction of the Replacement House on the . . . Property," and asked the trial court to retain jurisdiction in order to ensure the Township's and Trust's compliance. Naylors' Complaint at 13; R.R. at 26a.

In response, the Township filed an Answer with New Matter and Counterclaim/Cross-Claim. In the Answer, the Township contested the Naylors' request for relief. In the New Matter, the Township asserted that the Naylors' claims were barred and/or limited by the doctrines of estoppel, unclean hands, and laches,

9

the defense of waiver, and the Easement itself. In the Counterclaim/Cross-Claim, the Township sought a declaratory judgment of its own against the Naylors and the Trust under the DJA and the Conservation and Preservation Easements Act (Easements Act).[8] Specifically, the Township sought declarations that: (1) the only location on the Baughman Farm upon which the Easement permits a Replacement House is the site of the original Victorian House; (2) the Easement prohibits any structure except for "buildings necessary for agricultural purposes," to be built at other locations on the Baughman Farm; and (3) the Deed of Correction is a "nullity." Township's Answer with New Matter and Counterclaim/Cross-Claim at 15; R.R. at 122a.

The Trust filed its own Answer with New Matter, in which it also contested the Naylors' action and raised similar affirmative defenses as new matter. Trust's Answer with New Matter at 1-13; R.R. at 145a-57a. The Trust responded to the Township's Cross-Claim by joining in full the Township's request for declaratory judgment. Trust's Reply to Township's Counterclaim and Cross-Claim at 1-2; R.R. at 160a-61a.

Following discovery, the parties filed cross-motions for summary judgment. In the Naylors' Motion for Summary Judgment, the Naylors sought summary judgment on the grounds that: (1) the Easement permitted them to build a Replacement House on their Property at a location other than that of the original Victorian House; and (2) the Township should be estopped from interfering in the Naylors' efforts to reach an agreement with the Trust regarding the location of the Replacement House and clarification of the Easement language. Naylors' Motion for Summary Judgment at 24-31; R.R. at 190a-95a.

---

[8] Act of June 22, 2001, P.L. 390, 32 P.S. §§5051-5059.

In the Township's Motion for Partial Summary Judgment, it argued that it was entitled to judgment in its favor because: (1) the Easement permits a Replacement House to be built only at the original location of the Victorian House; (2) a Replacement House may be built at another location on the Property but only with the consent of both the Township and the Trust to amend the Easement; and (3) the Naylors never obtained the consent of the Township or the Trust to amend the Easement to allow for construction of a Replacement House at the Naylors' desired location. Township's Motion for Partial Summary Judgment at 9-13; R.R. at 498a-502a.

In the Trust's Motion for Summary Judgment and Judgment on the Pleadings, the Trust claimed that neither the Easement's language, nor the discussions between the Naylors and the Trust regarding potential revisions to the Easement, gave the Naylors the right to construct a Replacement House at a location of their choosing without the assent of both the Township and the Trust. On this basis, the Trust claimed it was entitled to judgment in its favor. Trust's Motion for Summary Judgment and Judgment on the Pleadings at 1-10; R.R. at 691a-700a.

On May 9, 2016, the Trust also interposed a motion to strike the Naylors' Motion for Summary Judgment on the basis that it was filed prematurely before the pleadings had closed. More particularly, the Trust averred that the Naylors failed to respond to the Trust's outstanding New Matter. The Trust also asserted that the Naylors' Motion failed to conform to the Pennsylvania Rules of Civil Procedure (Pa. R.C.P.). Trust's Motion to Strike at 1-4; R.R. at 1643a-46a.

The parties filed responses to their opponents' respective motions for summary judgment. The Naylors responded to the Trust's Motion to Strike and filed an answer to the Trust's New Matter. *See* R.R. at 1817a-25a.

11

By order dated July 7, 2016, the trial court[9] denied the Trust's Motion to Strike the Naylors' Motion for Summary Judgment. In a footnote, the trial court explained that the pleadings were closed twenty days after the Trust served new matter on the Naylors. Trial Court Order, 7/7/16, at 1 n.1 (citing Pa. R.C.P. No. 1029; *Newspaper Guild of Greater Philadelphia, AFL-CIO v. Philadelphia Daily News, Inc.*, 164 A.2d 215, 218 (Pa. 1960)). The trial court opined that, "when new matter is comprised solely of legal conclusions, a response is not required." Trial Court Order, 7/7/16, at 1 n.1 (citing Pa. R.C.P. No. 1029(d); *Gotwalt v. Dellinger*, 577 A.2d 623 (Pa. Super. 1990)). Furthermore, no reply is warranted where the factual allegations set forth in new matter are already set forth in the complaint and answer. Trial Court Order, 7/7/16, at 1 n.1. "New matter properly contains averments of facts only if they are extrinsic to facts averred in the complaint." *Id.* (quoting *Watson v. Green*, 331 A.2d 790, 792 (Pa. Super. 1974)). The trial court did not address the Trust's claim of procedural noncompliance. *See* Trial Court Order, 7/7/16, at 1 n.1.

By decision dated July 19, 2016, the trial court addressed the parties' cross-motions for summary judgment. First, the trial court held that the Township did not have standing to enforce the terms of the Easement because the Easement only allowed the Trust, as grantee, to enforce its terms. Trial Court Op., 7/19/16, at 8. The trial court also found that the Township did not have standing to enforce the terms of the Easement under the Easements Act because it was not an owner of the Property. The trial court reasoned that to hold otherwise would run counter to

---

[9] The Honorable Edward Griffith presided.

12

legislative intent, as well as to the Uniform Conservation Easement Act,[10] and would enable "the owner of any small parcel of property subject to a conservation easement [to] enforce the easement over much larger parcels, which would allow for a multiplicity of suits and easily frustrate one of the goals of the [Easements] Act, which is to encourage the placement of land into protective easements. [Section 2 of the Easements Act,] 32 P.S. §5052." Trial Court Op., 7/19/16, at 9. Thus, the trial court denied the Township's Motion for Partial Summary Judgment.

Turning to the Trust's and Naylors' cross-motions, the trial court examined the intertwined questions of whether, under the Easement, a Replacement House could only be built at the precise location of the original Victorian House, or whether it could be built elsewhere on the former Baughman Farm, as well as which party held "ownership" of the right to build such a residence. Trial Court Op., 7/19/16, at 10.

Upon reviewing the Easement, the trial court found that the Easement's purpose was unambiguously "to preserve the rural character of the area, the scenic quality of the farm, the diversity of wildlife in a variety of settings, and the historic and cultural value of the property." Trial Court Op., 7/19/16, at 13. However, the trial court also found that "[t]he Easement was not greatly concerned with the buildings on the farm." *Id.* at 17. There was nothing in the Easement that expressly limited where a Replacement House could be built. *Id.* "[T]he Easement preserves the [Grantor-Declarant]'s right to possess and enjoy all rights and privileges attendant to ownership of property, unless relinquished under the terms of the Easement." *Id.* at 16. This included "the right to locate a dwelling on the Baughman

---

[10] The Uniform Conservation Easement Act is a uniform law drafted by the National Conference of Commissioners on Uniform State Laws and approved and recommended for enactment in all the states.

13

Farm at any location he saw fit, provided that the selected location [was] not inconsistent with the servitude [*i.e.*, the Easement]." *Id.* at 17. Construing the agreements of sale that dealt with both the Mill Lot and the Property, the trial court then concluded that Bartschi's right to build a residence elsewhere on the Baughman Farm was transferred to the Naylors. *Id.* at 17-19. Thus, the trial Court denied the Trust's Motion for Summary Judgment and Judgment on the Pleadings, and granted partial summary judgment in favor of the Naylors as to the following issues:

> a.   The Easement allows for the construction of a [Replacement House] in a location other than the site of the Victorian House;
>
> b.   The . . . Foundation conveyed the right to construct a [Replacement House] to the Naylors;
>
> c.   The Naylors own the right to construct a [Replacement House] on the [P]roperty transferred to them by [the] Foundation (Chester County Parcels 35-2-8, 35-2-73 and 35-2-7[4]);
>
> d.   The Easement does not require the Township's approval of the location of the [Replacement House] and the Township is enjoined from interfering with enforcement of the Easement as it relates to the Naylors' Property (Chester County Parcels 35-2-8, 35-2-73 and 35-2-7[4]).

*Id.* at 19.

The trial court noted that three issues raised by the Naylors in their Complaint were not addressed in their Motion for Summary Judgment and, thus, remained unresolved. Trial Court Op., 7/19/16, at 19. Specifically, these issues included whether:

> 1.) [T]he Easement does not require the Trust's approval of a [R]eplacement [House;] 2.) the Naylors' construction

14

of a [R]eplacement [House] is subject only to the applicable requirements of the Township's Zoning Ordinance and Building Code[;] and 3.) the Township's only role is to administratively review and process the Naylors' building permit application for the [R]eplacement [House].

*Id.* To address these unresolved issues, the trial court held a two-day bench trial in May 2017, during which it reviewed a copious number of exhibits and heard testimony from Mr. Naylor, Naylor Attorney, various expert witnesses and representatives from the Trust.

By decision dated January 12, 2018, the trial court ruled that the Easement neither protected the "historic structures" located on the former Baughman Farm, nor vested the Trust with power "to approve the location, development or construction of the [Replacement House] to be built on the [Baughman Farm], but rather reserves the right to the Property owner," *i.e.*, the Naylors. Trial Court Op., 1/12/18, at 16, 18. Consequently, the Naylors do not need the Trust's authorization to build the Replacement House. Furthermore, the trial court found the Trust had already deemed two alternate locations on the Property to be compatible with the Easement's requirements, and held that the Easement allowed the Naylors to build "a single family residence and associated improvements, including residence structures, such as a detached garage, driveway, tennis court, swimming pool, shed and equipment enclosure, as well as septic, stormwater management, etc." at a suitable, Easement-compliant location. *Id.* at 16-17.

Finally, the trial court declined to rule upon the remaining two questions, involving the Township's powers and responsibilities in connection with the Naylors' construction of their new home. Because the Naylors had not yet applied for the necessary clearances and permits, the trial court determined that there

15

was no "real controversy" between the Naylors and the Township at that point. Furthermore, the Naylors had not yet exhausted their administrative remedies. Trial Court Op., 1/12/18, at 17-18.

Thereafter, the Trust filed a Motion for Post-Trial Relief, which the trial court denied on April 11, 2018.[11] Upon praecipe, judgment was entered in favor of the Naylors on April 19, 2018. *See* Pa. R.C.P. No. 227.4(2) (stating that the prothonotary shall enter judgment upon praecipe "when a [trial] court grants or denies relief but does not itself enter judgment or order the prothonotary to do so"). The Township and the Trust then both filed appeals, which we consolidated.

## II. Issues

In these consolidated appeals,[12] the Township and the Trust raise a mix of procedural and substantive questions.[13] Procedurally, the Township and the Trust both argue that the trial court erred as a matter of law by concluding that the Township lacked standing to enforce the Easement. They claim that the Township, as a fee simple owner of a portion of the former Baughman Farm burdened by the Easement, has standing to object to a modification to another parcel subject to the

---

[11] Because the trial court dismissed the Township's claims at the summary judgment stage, the Township was precluded from filing post-trial motions. *See* Pa. R.C.P. No. 227.1(c) *Note* ("A motion for post-trial relief may not be filed to orders disposing of . . . motions for judgment on the pleadings or for summary judgment . . . .").

[12] Appellate review of an order granting summary judgment is limited to determining whether the trial court committed an abuse of discretion or an error of law. *Weaver v. Lancaster Newspapers, Inc.*, 926 A.2d 899, 902 (Pa. 2007). Where a challenge raises a question of law, such as standing or jurisdiction, our standard of review is *de novo*, and our scope of review is plenary. *In re Hickson*, 821 A.2d 1238, 1242 (Pa. 2003).

[13] We have rearranged the sequence of issues and arguments for ease of discussion.

16

same Easement.  In addition, the Trust contends the trial court lacked jurisdiction over the subject matter of this dispute because it involves the Trust's interpretation of a document and rights vested therein, which falls within the exclusive jurisdiction of the Orphans' Court of Chester County.  The Trust also argues that the trial court erred by denying its Motion to Strike the Naylors' Motion for Summary Judgment as untimely filed.

Substantively, the Township argues that the trial court erred by not concluding that the Naylors' claims were barred by the doctrine of collateral estoppel.  The Township maintains that the doctrine of collateral estoppel prohibits the relitigation of issues previously resolved in the Sugerman Decision.  The Trust separately frames this issue asserting that the trial court failed to adhere to the legal doctrines of the law of the case and coordinate jurisdiction.

Next, the Township and the Trust argue that the trial court erred by entering summary judgment in favor of the Naylors and allowing them to construct a Replacement House on the Property for several reasons.  First, the Township and Trust argue that summary judgment is inappropriate here because material facts are in dispute, namely, the location of the Victorian House.  Second, they contend the trial court erred by allowing the Naylors to construct a Replacement House on their Property at a location other than the destroyed Victorian House arguing that this is at odds with the Easement and the Easements Act.  Third, they maintain that the right to rebuild was extinguished with the subdivision of Baughman Farm.  Fourth, they challenge the trial court's declaration that the Naylors are not limited to the footprint of the Victorian House and may construct a Replacement House in the style, size, configuration and construction of their choosing along with infrastructure and accessory structures.  Finally, the Trust contends that the trial court erred by

17

permitting the Naylors to construct a Replacement House in the style and location of their choosing without any governance or approval required by the Trust or Township.[14, 15]

### III. Discussion
### A. Procedural Issues
### 1. Township Standing

First, the Township and the Trust both argue that the trial court erred by ruling that the Township did not have standing to enforce the Easement. Both parties maintain that the Township, as a fee simple owner of the Mill Lot burdened by the same Easement, has statutory standing to challenge a violation of that Easement. In support, they rely on Section 5(a)(1) of the Easements Act, 32 P.S. §5055(a)(1), as authority. In addition, the Township further claims that it has standing under subsections (2) and (3) as well as the right to enforce the Easement as a third party under subsection (5) of Section 5(a) of the Easements Act, 32 P.S. §5055(a)(2), (3), (5).

The Easements Act identifies persons who have standing to bring legal action to enforce an easement. *Schwartz v. Chester County Agricultural Land*

---

[14] Rule 2137 of the Pennsylvania Rules of Appellate Procedure states: "In cases involving more than one appellant or appellee, including cases consolidated for purposes of the appeal pursuant to Rule 513 (consolidation of multiple appeals), any number of either may join in a single brief, and any appellant or appellee may adopt by reference any part of the brief of another. Parties may similarly join in reply briefs." Pa. R.A.P. 2137. Based on the foregoing, the Trust adopted the Township's interpretation of the Easement, the Township's position on standing, and "all grounds for reversing" the trial court. Trust's Brief at 16. The Trust also adopted by reference any supporting arguments set forth in the Township's Reply Brief. Trust's Reply Brief at 17. In turn, the Township specifically joined in the Trust's arguments regarding the location limitations of the Replacement House and interpretation of the Easement. Township Brief at 35-36.

[15] The Pennsylvania Land Trust Association filed an *amicus curiae* brief in support of the positions advanced by the Trust and Township.

*Preservation Board*, 180 A.3d 510, 514 (Pa. Cmwlth. 2018). Specifically, Section 5(a) of the Easements Act provides:

> (a) Persons who have standing.—A legal or equitable action affecting a conservation or preservation easement may only be brought by any of the following:
>
> *(1) An owner of the real property burdened by the easement.*
>
> *(2) A person that holds an estate in the real property burdened by the easement.*
>
> *(3) A person that has any interest or right in the real property burdened by the easement.*
>
> (4) A holder of the easement.
>
> *(5) A person having a third-party right of enforcement.*
>
> (6) A person otherwise authorized by Federal or State law.
>
> (7) The owner of a coal interest in property contiguous to the property burdened by the easement or of coal interests which have been severed from the ownership of the property burdened by the easement.

32 P.S. §5055(a) (emphasis added).

However, the Township does not fall within any of these categories. Although the Township's Mill Lot and the Property were once part of the former Baughman Farm and are burdened by the same Easement, the Mill Lot and the Property are two independent and distinct parcels of land and have been since the Baughman Farm was subdivided in 2002. The Township does not have standing

19

under subsections 5(a)(1), (a)(2), or (a)(3) of the Easements Act when it neither owns, holds an estate in, or otherwise holds an interest or right in the Property.

As for the Township's argument that it has standing under subsection 5(a)(5), this claim also fails. Section 3 of the Easements Act defines "[t]hird-party right of enforcement" as "[a] right provided in a conservation easement to enforce any of its terms, granted to a governmental body, charitable corporation, charitable association or charitable trust, which, although eligible to be a holder, is not a holder." 32 P.S. §5053. Under the terms of the Easement, only the Trust has the right to enforce the Easement. Easement at 14-15; R.R. at 1311a-12a. The Trust never formally conveyed its enforcement right to the Township. The mere fact that the Trust joined some of the Township's arguments before the trial court does not imbue the Township with its claimed "*de facto*" third-party right of enforcement. *See* Township Brief at 30. We, therefore, conclude that the trial court did not err in holding that the Township does not have standing in this matter.

## 2. Subject Matter Jurisdiction

Next, the Trust claims that the trial court lacked subject matter jurisdiction to hear the Naylors' declaratory judgment action. The Trust asserts that matters such as this belong within the exclusive jurisdiction and expertise of the Orphans' Court of Chester County.

Despite its current jurisdictional objections, the Trust never requested to have the Naylors' action transferred to Orphans' Court when it was before the trial court. While the issue of subject matter jurisdiction is not waivable, *see Blackwell v. State Ethics Commission*, 567 A.2d 630, 636 (Pa. 1989), "the proper selection of a division within the court of common pleas is not a jurisdictional

20

question . . . ." *Sto-Rox Focus on Renewal Neighborhood Corp. v. King*, 398 A.2d 241, 242-43 (Pa. Cmwlth. 1979). The Trust's argument is little more than an attempt to forum shop after the fact between divisions of coordinate jurisdiction, which we will not entertain.

### 3. Motion to Strike

In addition, the Trust contends that the trial court erred by denying its Motion to Strike the Naylors' Motion for Summary Judgment as untimely. According to the Trust, the Naylors filed their Motion for Summary Judgment prematurely, before the pleadings had closed. Specifically, the Naylors filed their Motion on April 8, 2016, without addressing the New Matter raised by the Trust on December 19, 2014. The Naylors did not file an Answer to the Trust's New Matter until May 20, 2016 – well after the 20-day period in which to do so had closed. Consequently, the pleadings were not closed when the Naylors filed their Motion for Summary Judgment.

Pa. R.C.P. No. 1035.2 governs motions for summary judgment and provides:

> After the relevant pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for summary judgment in whole or in part as a matter of law
>
> (1) whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or
>
> (2) if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has

> failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury.

Pa. R.C.P. No. 1029(a) provides: "A responsive pleading shall admit or deny each averment of fact in the preceding pleading or any part thereof to which it is responsive." However, "[a]verments in a pleading to which no responsive pleading is required shall be deemed to be denied." Pa. R.C.P. No. 1029(d). This includes conclusions of law. *Phantom Fireworks Showrooms, LLC v. Wolf*, 198 A.3d 1205, 1219 (Pa. Cmwlth. 2018).

Here, the Naylors filed their Motion for Summary Judgment without first responding to the Trust's New Matter. Although it appears at first blush that the pleadings were in fact still open, upon closer examination of the pleadings, the Trust did not introduce new statements of fact. The Trust's New Matter reads as follows:

> 47. [The Trust's] answers to paragraphs 1 through 46 are incorporated by reference as though fully set forth at length.
>
> 48. [The Naylors'] claims are barred and/or limited by the doctrine of estoppel.
>
> 49. [The Naylors'] claims are barred and/or limited by the doctrine of unclean hands.
>
> 50. [The Naylors'] claims are barred and/or limited by the doctrine of laches.
>
> 51. [The Naylors'] claims are barred by the doctrine of merger.
>
> 52. [The Naylors'] claims are barred by the statute of frauds.

22

53. [The Naylors'] claims are barred and/or limited by the defense of waiver.

54. The . . . Easement is governed by the . . . Easements Act[,] which requires liberal construction in favor of the grants contained therein to effect the purposes of the easements. 32 P.S. §5055(c)(2).

55. [The Naylors'] claims are barred and/or limited by the . . . Easement and its clear prohibition against any other structure being constructed on [CCTP] Nos. 35-2-8, 35-2-73, 35-2-74, and 35-2-74.2 except for buildings necessary for agricultural purposes, which does not include a home or dwelling.

56. [The Naylors'] claims are barred and/or limited because the . . . Foundation had no right to construct a dwelling [on] [CCTP] No. 35-2-74[;] the . . . Foundation did not possess the ability to convey that right to the [Naylors].

57. [The Naylors'] claims are barred and/or limited because other than rebuilding the historic dwelling on the property owned by the Township, the right to build on [the Naylors'] property was conveyed away by the previous owner of that property (prior to the . . . Foundation), and cannot be resurrected by [the Naylors] through the filing of a "Deed of Correction" or any other conveyance by the . . . Foundation.

Trust's Answer with New Matter, 12/19/14, at 12-13; R.R. at 156a-57a.

Upon review, Paragraphs 47 through 54 are legal conclusions, and, as such, they are deemed denied without formal response. *See* Pa. R.C.P. No. 1029(d); *Phantom Fireworks*, 198 A.3d at 1219. Although paragraphs 55 through 57 contain factual averments, these averments essentially challenge the Naylors' already-articulated claim that they have the right, under the terms of both their agreement of sale with the Foundation and the Easement itself, to build a residence at another Easement-compliant spot on the Property without the Trust's advance permission.

23

*See* Naylors' Complaint at 9-11; R.R. at 23a-25a. Thus, the Trust's averments do not contain "new" statements of fact, but are "merely responsive to the averments of [the Naylors'] [C]omplaint and, under our rules of procedure[,] should have been set forth in the answer." *Saxe v. Feinstein*, 77 A.2d 419, 421 (Pa. 1951); *see Watson*, 331 A.2d at 792 ("New matter properly contains averments of facts only if they are extrinsic to facts averred in the complaint."). Thus, we conclude that the trial court did not err by denying the Trust's Motion to Strike.

### B. Substantive Issues
### 1. Collateral Estoppel, Law of the Case & Coordinate Jurisdiction

Turning to the substantive issues, the Trust, having adopted the Township's arguments in this regard,[16] argues that the Naylors' claims in this matter are barred by the doctrine of collateral estoppel. The Trust maintains that the Naylors' claims were previously litigated and disposed of in the Sugerman Decision. Judge Sugerman analyzed the subject Easement and Property and opined that the purpose of the Easement was to maintain the Baughman Farm as it existed when the Easement was conveyed and did not permit the erection of "additional buildings or structures . . . except as may be necessary for agricultural purposes." Sugerman Decision at 12; R.R. at 296a. Under the doctrine of collateral estoppel, the Naylors are bound by this decision and may not relitigate these claims.

In addition, the Trust asserts that the trial court was required to adhere to the Sugerman Decision under the legal doctrines of law of the case and coordinate

---

[16] The collateral estoppel issue was raised and fully developed by the Township, not the Trust. Having determined that the Township lacks standing, ordinarily, we would not address the Township's substantive challenges on appeal. *See Society Hill Civic Association v. Pennsylvania Gaming Control Board*, 928 A.2d 175, 177 (Pa. 2007). However, because the Trust incorporated and adopted the Township's arguments pursuant to Pa. R.A.P. 2137 and has standing to raise this issue, the issue remains viable.

24

jurisdiction. The Sugerman Decision was issued by a court of coordinate jurisdiction and represents the law of the case in this matter. Consequently, the trial court was not permitted to depart from Judge Sugerman's interpretation of the Easement in its decision.

The doctrine of collateral estoppel precludes relitigation of an issue settled in a previous action if:

> (1) the issue decided in the prior case is identical to the one presented in the later action; (2) there was a final adjudication on the merits; (3) the party against whom the plea is asserted was a party or in privity with a party in the prior case; (4) the party or person privy to the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior proceeding; and (5) the determination in the prior proceeding was essential to the judgment.

*Office of Disciplinary Counsel v. Kiesewetter*, 889 A.2d 47, 50-51 (Pa. 2005).

The doctrine of "law of the case" sets forth various rules that embody "the concept that a court involved in the later phases of a litigated matter should not reopen questions decided by another judge of that same court or by a higher court in the earlier phases of the matter." *Commonwealth v. Starr*, 664 A.2d 1326, 1331 (Pa. 1995). "However, this doctrine applies only when a court is later asked to consider the *same question* decided by another court of equivalent or higher jurisdiction." *Commonwealth v. Wright*, 14 A.3d 798, 817 (Pa. 2011) (emphasis added). The related doctrine of coordinate jurisdiction provides that judges of equal jurisdiction sitting in the same case should not overrule each other's decisions. *Ario v. Reliance Insurance Co.*, 980 A.2d 588, 597 (Pa. 2009); *Starr*, 664 A.2d at 1331.

Upon review, the doctrines of collateral estoppel, law of the case and coordinate jurisdiction do not apply because the issues involved here were not before

Judge Sugerman. The issue before Judge Sugerman was whether the landowner could erect "*two* dwellings upon the Baughman [Farm]," namely, "a principal dwelling *and an associated tenant house*." Sugerman Decision at 4, 6 (emphasis added); R.R. at 286a, 290a. Judge Sugerman determined that "the Easement clearly prohibits the construction of *two* residential dwellings" on the Baughman Farm. Sugerman Decision at 10 (emphasis added); R.R. at 294a. Ultimately, he declared that the Easement did "not permit the construction or erection of a *second separate dwelling* upon the Baughman [Farm]." Sugerman Decision at 15 (emphasis added); R.R. at 299a. However, Judge Sugerman never resolved the issues of whether one residential dwelling must be located in the exact same spot at the Victorian House or replicated in the style of the Victorian House.[17]

Notwithstanding, the Trust argues that the parties and trial court are bound by Judge Sugerman's interpretation of the Easement. In this regard, Judge Sugerman opined:

> It is quite clear from the many recitals in the Easement that the overriding purpose or object of the Easement was to maintain the Baughman [Farm] in its physical condition at the date the Easement was granted: a Victorian dwelling, a mill and a barn, and the remainder of the Baughman [Farm] as open space.

---

[17] Judge Sugerman noted:

> We have not been requested to and thus do not decide the questions of (1) whether the Victorian [House] formerly on the Baughman [Farm] may be restored only in the same configuration and style as heretofore, and (2) whether the said dwelling may only be erected at the location where the earlier dwelling was located.

Sugerman Decision at 14, n.5; R.R. at 298a.

Sugerman Decision at 12; R.R. at 296a. However, this passage had no bearing on Judge Sugerman's determination that a *second* dwelling was not permitted under the Easement. Consequently, it was not "essential" to the judgment. Judge Sugerman's discussion in this regard constitutes nonbinding dicta. Therefore, we conclude that the doctrine of collateral estoppel does not apply. Because the trial court did not "reopen questions" previously decided by another judge of the same court in an earlier phase of the matter, the doctrines of law of the case and coordinate jurisdiction are similarly inapplicable.

## 2. Summary Judgment – Disputed Fact

Next, the Trust argues that summary judgment was inappropriate because a genuine issue of material fact remains unresolved and in dispute. Specifically, there is no agreement among the parties regarding the location of the Victorian House. There is conflicting evidence in the record as to where exactly the Victorian House was located on the former Baughman Farm. It is unclear whether the Victorian House was entirely on the Property, entirely on the Mill Lot, or straddled the two. The Trust argues that the location of the Victorian House is critical to the outcome.

"Summary judgment is appropriate in cases 'where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.'" *Maas v. UPMC Presbyterian Shadyside*, 234 A.3d 427, 436 (Pa. 2020) (quoting *Nicolaou v. Martin*, 195 A.3d 880, 891 (Pa. 2018); *accord* Pa. R.C.P. No. 1035.2(1)). "A fact is material only if it directly affects the disposition of a case." *Pyeritz v. Commonwealth*, 956 A.2d 1075, 1079 (Pa. Cmwlth. 2008) (quoting *Allen v. Colautti*, 417 A.2d 1303, 1307 (Pa. Cmwlth. 1980)), *aff'd*, 32 A.3d 687 (Pa. 2011).

27

Although the location of the original Victorian House is uncertain and the parties dispute its whereabouts, the exact location of the Victorian House is material *only if* the Easement limited the location of a Replacement House to that exact location. For the reasons that follow, we conclude that the trial court did not err or abuse its discretion in determining that this fact was not material to the disposition of the case.

### 3. Location of the Replacement House

Turning to the crux of the matter, the Trust argues that the trial court erred by granting partial summary judgment to the Naylors with regard to the right to rebuild a Replacement House at a location of their choosing that does not violate the Easement. According to the Trust, the Easement does not permit a single-family dwelling to be constructed anywhere other than the location of the former Victorian House. Although the Easement did not contemplate the destruction of the Victorian House, the Easement prohibits any new buildings unless necessary for agricultural purposes. The clear purpose of the Easement is to preserve the Baughman Farm as it existed when the Easement was created and its pastoral setting and scenic views. Under the Easements Act, the Easement must be liberally construed to effectuate the purpose of the Easement. When viewed in this context, the only place that a Replacement House could logically be constructed is the site of the former Victorian House. By permitting the Naylors to build a new Replacement House at any another location, the trial court directly contravened both the restrictive language and the purpose of the Easement in violation of the Easements Act.

28

## a. Easement Construction

We must first address whether construction of this Easement is guided by the Easements Act or by the common law. When the General Assembly enacted the Easements Act in 2001, it "recognized the importance and significant public and economic benefit of conservation and preservation easements in its ongoing efforts to protect, conserve or manage the use of the natural, historic, agricultural, open space and scenic resources of this Commonwealth." Section 2 of the Easements Act, 32 P.S. §5052. The General Assembly instructed: "Any general rule of construction to the contrary notwithstanding, *conservation or preservation easements shall be liberally construed in favor of the grants contained therein to effect the purposes of those easements* and the policy and purpose of [the Easements Act]." Section 5(c)(2) of the Easements Act, 32 P.S. §5055(c)(2) (emphasis added). However, the Easements Act may not be applied retroactively where doing so "contravenes the Constitution of the United States or laws of the United States or of this Commonwealth." Section 7(b) of the Easements Act, 32 P.S. §5057(b).

The subject Easement was created in 1986, 15 years before the Easements Act went into effect in 2001. In this proceeding, the Trust advances a liberal interpretation of the Easement that would augment the rights conveyed in favor of the grant and diminish the rights reserved thereunder. Applying the Easements Act's liberal construction analysis in this manner would create a significant impairment of contract, which is contrary to the federal and state constitutions. *See Association of Settlement Companies v. Department of Banking*, 977 A.2d 1257 (Pa. Cmwlth. 2009) (analysis of impairment of contract issues under both U.S. and Pennsylvania Constitutions). Therefore, we shall review the Easement under the common law rules of construction, which are the same rules applicable to

contract interpretation. *Zettlemoyer v. Transcontinental Gas Pipeline Corp.*, 657 A.2d 920, 924 (Pa. 1995).

Under contract law, the fundamental rule of construction is determining the intention of the parties as manifested by the language of the written instrument. *Id.*; *Unit Vending Corp. v. Lacas*, 190 A.2d 298, 300 (Pa. 1963). "Such intention [of the parties] is determined by a fair interpretation and construction of the grant and may be shown by the words employed construed with reference to the attending circumstances known to the parties at the time the grant was made." *Zettlemoyer*, 657 A.2d at 924 (quoting *Lease v. Doll*, 403 A.2d 558, 561 (Pa. 1979)). "[T]he court will adopt the interpretation, which under all of the circumstances of the case, ascribes the most reasonable, probable and natural conduct of the parties, bearing in mind the objects manifestly to be accomplished." *Unit Vending*, 190 A.2d at 300.

Where the words of the contract are clear and unambiguous, the intent of the parties must be determined exclusively from the agreement itself. *Suffolk Construction Co. v. Reliance Insurance Co.*, 221 A.3d 1205, 1210 (Pa. 2019). The court is required to give effect to that language. *Id.* Words not defined are given their plain and ordinary meaning. *Id.* at 1212-13; *Riccio v. American Republic Insurance Co.*, 705 A.2d 422, 426 (Pa. 1997). Only where the language of the written contract is ambiguous, may extrinsic or parol evidence be considered to determine the intent of the parties. *Suffolk*, 221 A.3d at 1214.[18] Thus, we begin by

[18] A contract will be found to be ambiguous:

> [I]f, and only if, it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning. A contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge

**(Footnote continued on next page…)**

30

examining the Easement itself, which is "the polestar of our inquiry." *Schwartz*, 180 A.3d at 514.

### b. Easement

The Easement devotes nine pages to whereas recitals recognizing the rural, scenic, historic and cultural value of the Baughman Farm and surrounding Pickering Creek Valley. To wit:

> WHEREAS, the Pickering Valley is still rural and relatively free from over-development and commercial or industrial intrusion and is of high scenic quality.
>
> WHEREAS, the [Baughman Farm] is partly in open tilled fields and pasture, partly wooded, partly grown up with small trees and bushes which create fine wildlife and bird cover, with topography including some floodplain and also some high water table or wet areas; and
>
> . . .
>
> WHEREAS, the [Baughman Farm] lies in the area recommended for preservation in the Report [titled "Pickering Creek Valley: A Preservation Opportunity"] as a Critical Environmental Preservation District, high in historic and cultural values, and also designated in the Report as possessing high scenic quality, and within a Scenic Corridor as designated by the Report; and

---

of the simple facts on which, from the nature of language in general, its meaning depends; *and a contract is not rendered ambiguous by the mere fact that the parties do not agree upon the proper construction.*

*Commonwealth State Highway and Bridge Authority v. E.J. Albrecht Co.*, 430 A.2d 328, 330 (Pa. Cmwlth. 1981) (quoting 8 P.L.E. CONTRACTS §146 (1971)) (emphasis added). The parties do not argue that the Easement is ambiguous. Upon review, we agree that the Easement is not ambiguous.

31

> WHEREAS, the [Baughman Farm] is in Charlestown Township, which is noted for its scenic beauty and historic values; and
>
> *WHEREAS, all the buildings on the [Baughman Farm] are on the National Register of Historic Places and are part of the Charlestown National Historic District; and*
>
> *WHEREAS, one of such buildings is an historic water[-]powered mill, first used as a fulling mill and later a grist and cider mill and the dwelling house on the [Baughman Farm] is a classic example of Victorian architecture*[.]

Easement at 2-3 (emphasis added); R.R. at 1298a-99a.

The Easement describes the Grantor-Declarant's desire to preserve the "agricultural, historic, scenic and relatively natural state of the [Baughman Farm] and further desires to conserve and protect the scenic nature of the [Baughman Farm]." Easement at 4; R.R. at 1301a. The Grantor-Declarant also expressed his desire to preserve the "surrounding lands from soil erosion, water pollution, natural disruptions, visual intrusion and other occurrences which might interfere with the beauty and unique character of the [Baughman Farm] as it exists in its relatively natural, scenic, historic and agricultural state . . . ." Easement at 4; R.R. at 1300a.

The Easement provides the following particulars:

I. <u>Water and Water Supply</u>

II. <u>Scenic Enjoyment of the General Public</u>

> The [Baughman Farm] is in full view from several well[-]traveled public roads one of which passes through it and bisects it and the others adjoin it or pass near it. The views from these public roads and from the lands open to the public which adjoin or lie near the [Baughman Farm] give fine panoramas across the gently sloping fields, meadows and woodlands of the [Baughman Farm], across the

Pickering Creek and looking upward across the lowlands and rising slopes to wooded ridges on the north, east and south of the [Baughman Farm] which are strong features of the local landscape. From all directions, the prospect is scenic and beautiful. In addition, the historic buildings on the [Baughman Farm] are most attractive examples of 19th century architecture of both wooden and stone construction.

III.   Protection of the Natural Habitat or Ecosystem of Wildlife, Plants and Fish

(a) Wooded Area . . . .
(b) Wildlife. . . .
(c) Fish Life. . . .
(d) The fields and pastures also provide feed for animals and birds and a relatively natural habitat.

IV.   Public Recreation and Education
Pickering Creek affords recreational fishing to the general public. Members of the public driving on the public roads can get a charming view of a 19th century farm setting.

V.   Preservation of Farmland

. . .

VI.   County Planning for Open Space and Recreation

Easement at 5-7 (emphasis in original); R.R. at 1302a-04a.

The stated purpose of the Easement is:

*preserving the beauty and unique character of the [Baughman Farm], and its environs as they exist in their historic, scenic, agricultural and relatively natural state*, subject to the qualifications hereinafter set forth, and of conserving and protecting the [Baughman Farm] and surrounding lands from any natural disruptions or other occurrences which might interfere with the same, including, without limitation, soil erosion, water pollution

33

and visual disruptions or intrusions in *or upon the general scene as viewed from the roads which pass nearby or run through the [Baughman Farm], or from surrounding public and protected areas.*

Easement at 10 (emphasis added); R.R. at 1307a. In order to accomplish this intent, the Grantor-Declarant agreed that the Baughman Farm "shall remain in its present relatively natural and scenic state subject to the qualifications hereinafter mentioned, and shall not be the subject of residential (except as hereinafter provided), industrial or commercial development (except farming)." Easement at 10 (emphasis added); R.R. at 1307a.

In furtherance thereof, Grantor-Declarant imposed the following restrictions:

> A. *No industrial or commercial activities, with the exception of farming, or the operation of the aforesaid mill, shall be conducted or permitted on the [Baughman Farm]*;
>
> B. *No new or additional buildings or structures (as hereinafter defined) shall be built and maintained on the [Baughman Farm].*
>
> . . .
>
> D. No signs, billboards or outdoor advertising structure shall be displayed on the [Baughman Farm] other than one sign not exceeding four feet by six feet for [limited enumerated purposes] . . . .
>
> E. There shall be no depositing or dumping of solid or liquid refuse, waste or junk upon the [Baughman Farm], excepting effluent from buildings and structures permitted hereby . . . .

34

Easement at 12-13 (emphasis added); R.R. at 1309a-10a. Section C of the Easement defined the following terms:

> (1) "Farming" shall include the commercial production of any and all plant and animal products, including Christmas trees, and the breeding, raising, using, maintaining or sale of any livestock including horses, mules and donkeys.
>
> (2) "Building" and "structure" shall include the ordinary usage of the words[,] as well as asphalt or concrete roads, driveways and parking lots, mobile homes, (meaning transportable dwellings intended for permanent or semi-permanent occupancy or office or place of assembly, but not including recreational trailers), pipelines, drainage swales, poles, or any other facilities normally used in supplying utilities or removing effluent or surface water; provided, however, that the restrictions in this [Easement] as to buildings and structures shall not apply to structures or facilities for the use or benefit of the general public or a portion thereof other than the Grantor-Declarant, Trust, and their or its respective heirs, devisees, executors, administrators, successors or assigns or any person holding by, through or under them or any of them, which structures or facilities are acquired or constructed by the United States, the Commonwealth of Pennsylvania or any political subdivision or municipality thereof, or any other public agency having or performing governmental functions, or by any private or public corporation having or using the power of eminent domain whether such acquisition or construction shall be made under such power or by private treaty, other contract, or otherwise.

Easement at 11-12; R.R. at 1308a-09a.

The parties to the Easement agreed that "the following uses and practices of and on the [Baughman Farm], though not an exhaustive recital of consistent uses and practices," are permitted:

> (a)    To pasture and graze livestock and to continue agricultural activity on the [Baughman Farm] . . . [;]

35

(b)    Subject to sub-paragraph (a) above, to institute and carry on any agricultural activity . . . [;]

(c)    To develop and maintain those water resources on the [Baughman Farm] . . . [;] [and]

(d) Subject to all the limitations stated elsewhere in this [Easement,] *to maintain and repair fences, buildings and other improvements on the [Baughman Farm] and to place upon the [Baughman Farm] those additional fences, buildings and other improvements as may be necessary for agricultural purposes*, all in consonance with Paragraphs C [(definition of "farming," "building" and "structure")] and D above [(advertising)][.]

Easement at 13-14 (emphasis added); R.R. at 1310a-11a.

Finally, the Easement reserved certain rights in the Grantor-Declarant, its servants, successors or assignees.  Specifically,

I. Nothing herein shall be construed as a grant to the general public or to a person or persons other than Grantee, its servants, successors or assigns or its duly authorized agents, of the right to enter upon the [Baughman Farm]. Grantor-Declarant reserves unto himself and his successors in title to the [Baughman Farm], all rights, privileges, powers and immunities in  respect to the [Baughman Farm], including, without limitation, *the right of exclusive possession and enjoyment subject only to the restrictions and easements set forth in, and the terms and covenants of, this Grant  and Declaration*.

Easement at 15 (emphasis added); R.R. at 1312a.

### c. Location

Although the Easement did not contemplate the destruction of the Victorian House, it did account for the maintenance and repair of buildings. Easement at 14; R.R. at 1311a.  The parties agree that this language embraced the

36

right to replace the Victorian House on the Baughman Farm, but the question remains where the new house may be built.

Applying the foregoing principles of construction and based on our review of the Easement, we discern no restriction, either directly or by inference, limiting the location for a Replacement House to the site of the former Victorian House. The Easement identifies only two buildings – the Victorian House and the Mill. When the Easement was executed, one additional building existed on the Baughman Farm, but it was not identified by name in the Easement.[19] Notably, the Easement does not identify the locations of any of the buildings on the Baughman Farm by "words, plans, drawings, or otherwise." Trial Court Op., 7/19/16, at 17. As the trial court found, "[t]he Easement was not greatly concerned with the buildings on the farm." *Id.*

While the Easement clearly restricts additional dwellings, it does not restrict the addition of all new buildings. Indeed, the Easement permits the addition of "fences, buildings and other improvements *as may be necessary for agricultural purposes*." Easement at 14 (emphasis added); R.R. at 1311a. This would include a barn to house livestock or store hay, an equipment shed, a grain silo, a greenhouse, a chicken coop, or any myriad of agricultural buildings. The Easement does not direct or expressly restrict where any of the agricultural buildings or improvements may be placed on the Baughman Farm. The Easement merely provides that the erection of such buildings are "subject to all limitations stated elsewhere" and must be "in consonance" of paragraphs C (definitions of "farming," "building" and "structure") and D (advertising) of the Easement. Easement at 13-14; R.R. at 1310a-

---

[19] The additional building is a stone and wood barn located on the Property, which the Naylors have since restored. R.R. at 1860a-64a.

11a. Such limitations include protecting water, soil, natural habitats and ecosystems; preserving the public's scenic enjoyment; maintaining open space; preserving farmland; and protecting the relatively natural state of the Baughman Farm. We conclude that the same limitations apply to the location of the Replacement House. Such limitations do not restrict the location of a Replacement House to the exact situs of the Victorian House. Consequently, the exact location of the Victorian House is immaterial. *See Pyeritz*, 956 A.2d at 1079.

While we understand the Trust's concerns that some locations may be less harmonious with the Easement's objectives than others, the Trust reviewed two proposed locations submitted by the Naylors to build the Replacement House.[20] According to the record, the Trust acknowledged that the proposed alternate locations were sited sensitively to preserve the historic nature of the Baughman Farm consistent with the Easement's servitude.[21] *See* R.R. at 267a, 349a, 474a-75a, 2087a-

---

[20] The Naylors have expressed the desire to have the building reservation sited sensitively to preserve the historic nature of the Baughman Farm, its viewsheds and best pasturelands. R.R. at 1871, 1887a. Some locations were unsuitable because of natural impediments such as wetlands, steep slopes and trees. R.R. at 267a-68a. Other locations were eliminated because of the Naylors' desire to preserve the best pastureland for grazing livestock, which presently include Scottish Highland cows. R.R. at 1859a, 1867a, 1879a-80a.

[21] Mr. Naylor testified regarding both sites. Mr. Naylor preferred one site over the other and explained his preference. The preferred site is close to the restored barn, which "fits in more with a farm style. A farmer wouldn't build his house, you know, 1,000 feet away from the barn. He would build it closer to the barn." R.R. at 1879a. Mr. Naylor uses the barn to provide protection for his cows in the winter months. R.R. at 1860a. At the preferred location, "the driveway is already cut by the barn, so it's easy to take that driveway up the hill and the driveway wouldn't necessarily have to be windy like it's shown on the map. It could be straight and take up much less pastureland." R.R. at 1879a-80a. In addition, this location would preserve the best pastureland for grazing livestock. R.R. at 1881a. The preferred site has limited views from Church Road because of existing foliage and the Naylors propose to plant trees to obscure the Replacement House and minimize any visual intrusion from the Charlestown Road view. R.R. at 1880a. This location also does not contemplate the removal of any existing trees. *Id.*

38

88a; *see also* 1869a-71a.  Because the Trust's determination regarding the suitability of two proffered locations is not contrary to the Easement's plain language, the trial court did not err in determining that the Trust is estopped from challenging the suitability of these locations.

### 4. Right to Rebuild Extinguished

Notwithstanding, the Trust argues that the right to rebuild a Replacement House was conveyed away when the Baughman Farm was subdivided into the Property and Mill Lot.  Consequently, the Trust maintains that the right to rebuild on the Property was completely extinguished and cannot be resurrected.

"[T]he grantor of a conservation easement retains ownership of the servient land and may use the property for any purpose not inconsistent with the servitude." *Ephrata Area School District v. County of Lancaster*, 886 A.2d 1169, 1177 (Pa. Cmwlth. 2005), *rev'd on other grounds*, 938 A.2d 264 (Pa. 2007).  The Restatement (Third) of Property, Servitudes §4.9 (American Law Institute 2000) states: "except as limited by the terms of the servitude . . . the holder of the servient estate is entitled to make any use of the servient estate that does not unreasonably interfere with enjoyment of the servitude."

In the Easement, the Grantor-Declarant reserved unto himself and his successors in title to the Baughman Farm:

> [A]ll rights, privileges, powers and immunities in respect
> to the [Baughman Farm], including, *without limitation, the*
> *right of exclusive possession and enjoyment* subject only
> to the restrictions and easements set forth in, and the terms
> and covenants of, this [Easement].

39

Easement at 15 (emphasis added); R.R. at 1312a. The right to possess and enjoy, without limitation, clearly embraces the right to reside and dwell upon the land and to cultivate the same. Such use is not inconsistent with the servitude of the Easement. When Bartschi conveyed the Baughman Farm to the Foundation, the Foundation became the successor in title to the Baughman Farm and the holder of these reserved rights.

When the Foundation conveyed the Mill Lot to the Township for nominal consideration, it conveyed "all improvements located thereon, including, but not limited to the structure known as the '[] Mill.'" R.R. at 58a. In return, the Township agreed "not to construct any new structure on the [Mill Lot] except in connection with utilities, water pipes, driveway or parking lot, fences, restroom facilities, or any structures physically connected to [t]he Mill, such as a bathroom." R.R. at 59a. This did not preclude the Township "from doing any construction related to any renovation or repair of any part of [t]he Mill." *Id.* The conveyance gave the Township the right to restore the Mill and erect any necessary improvements limited to the Mill restoration, but prohibited the Township from otherwise constructing any new structures.

The subdivision and conveyance of the Mill Lot did not transfer or otherwise diminish the "rights, privileges, powers and immunities"[22] otherwise held by the Foundation with respect to the remainder of the Baughman Farm, *i.e.*, the Property, including the right to rebuild. Even if the Victorian House had been situated on the Mill Lot, the Foundation did not convey the right to rebuild the dwelling to the Township, but rather prohibited the Township from constructing any new structures. There is simply no evidentiary or legal support for the Trust's

---

[22] Easement at 15; R.R. at 1312a.

40

position that the Foundation relinquished or extinguished its residual right under the Easement. Therefore, the right to rebuild a single-family dwelling remained with the Foundation as the owner of the remainder of the Baughman Farm – the Property.

When the Foundation conveyed the Property to the Naylors, it transferred "all rights, privileges, powers and immunities" with it. Easement at 15; R.R. at 1312a. The Naylors, as the current successors in interest under the Easement are entitled to possess and enjoy the Property, which includes the right to build the Replacement House.[23] Thus, we conclude that the trial court did not err in determining that the right to rebuild remained with owners of the Property and was not conveyed or otherwise extinguished with the creation and conveyance of the Mill Lot.

## 5. Style, Size, Configuration & Construction of Replacement House

Next, the Trust argues that the trial court erred by allowing the Naylors to construct a Replacement House in the design, style and size of their choosing

---

[23] Allowing the Naylors to construct a Replacement House on their Property is the most reasonable and logical interpretation of the Easement "bearing in mind the objects manifestly to be accomplished." *Unit Vending*, 190 A.2d at 300. While the preservation of open space and scenic views is certainly an important goal under the Easement, the retention of agriculture and farmland is just as important. *See* Easement at 4, 9; R.R. at 1301a, 1306a. The Easement recognizes that the Property "has been farmed since colonial times and still is farmed." Easement at 1; R.R. at 1298a. By allowing the erection of a Replacement House upon the Property, the Easement is served by ensuring that the Property will continue into perpetuity as a family farmstead complete with a house and agricultural buildings surrounding it. Just as buildings are necessary to house livestock, farm equipment and feed, the replacement of a dwelling is necessary to house the stewards of this Property, who will maintain and oversee the agricultural activities taking place thereon. To conclude otherwise and deprive the Naylors and future stewards of the Property the ability to live on the Property would deprive them of the very "right of exclusive possession and enjoyment," which the Grantor-Declarant expressly reserved "unto himself and his successors in title to the Property." Easement at 15; R.R. at 1312a.

41

along with all the attendant accoutrements as other single-family dwellings including necessary infrastructure such as "septic, stormwater management," as well as associated residential improvements including "a detached garage, driveway, tennis court, swimming pool, shed or equipment enclosure," subject only to the limits of the Township's Zoning Ordinance and Building Code. Trial Court Order, 1/12/18, at 1. The Trust insists that the size of the Replacement Home must be limited to the footprint of the Victorian House. According to the Trust, the Naylors' proposed construction constitutes a new building supported by new structures in violation of the Easement.

Just as there are no restrictions regarding the location of the Replacement House under the Easement, there are no express or implied restrictions regarding its style, size, configuration or construction. Although the Easement notes that the dwelling house was a "classic example of Victorian architecture," it also recognizes that the Baughman Farm has "been farmed since colonial times." Easement at 1, 3; R.R. at 1298a, 1300a. The Easement describes the "historic buildings on the [Baughman Farm]" as the "most attractive examples of 19th century architecture of both wooden and stone construction." Easement at 6; R.R. at 1302a. Beyond that, the Easement does not provide any other description regarding the configuration, such as how many stories, square footage, porch or portico, etc. It does not describe the style of Victorian House, such as the Second Empire, Gothic Revival, Queen Anne, Italianate, etc. There is also no indication regarding the style or configuration of the other buildings, such as the Mill or the barn.

As the trial court found: "The Easement does not preserve historic structures. Mr. Bartschi did not identify as a conservation value the historic aspects

of the buildings on the Property and the Trust has acknowledged as much." Trial Court Op., 1/12/18, at 15.

While the Easement clearly permits buildings necessary for agriculture, it provides no guidance or limitations as to their style, size, configuration or construction. The Easement could have easily noted that all agricultural buildings must be faithful to the Victorian or Colonial period, but it did not.

Whether the building is a new agricultural building or a replacement of an existing structure, the Easement contains no restrictions as to the style, size or configuration or construction. Therefore, these decisions are reserved to the Grantor-Declarant and his successors in title in the Easement.

As the trial court found, a single-family detached dwelling is permitted to have all the attendant accessory improvements as other single-family dwellings including necessary infrastructure such as "septic, stormwater management," as well as associated residential improvements including "a detached garage, driveway, tennis court, swimming pool, shed or equipment enclosure," subject only to the limits of the Township's Zoning Ordinance. Trial Court Order, 1/12/18, at 1. These are not "new or additional buildings or structures," but are part of the retained right to build a single-family residence permitted under the Easement.

Upon review, the trial court did not err in determining that the Replacement House is not required to replicate the Victorian House and that "the choice of design or style and the dimensions of the house belongs to the Naylors."[24]

---

[24] During the proceedings, Township Supervisor testified regarding his opposition to and fear of "a big McMansion in the middle of the field" or "some ugly, modern skyscraper." R.R. at 374a, 427a. Such fears are largely unfounded, as even Township Supervisor admitted. *See* R.R. at 374a. Although it is unclear exactly what the Naylors propose to build on the Property, they have demonstrated a deep appreciation and respect for the historic and cultural significance of the **(Footnote continued on next page…)**

Trial Court Op., 1/12/18, at 15. To conclude otherwise would interfere with the retained right to possess and enjoy the Property and would improperly fashion restrictions not otherwise expressed or intended in the Easement. *See Morris v. South Coventry Township Board of Supervisors*, 836 A.2d 1015, 1018-19 (Pa. Cmwlth. 2003) (rejecting a party's attempt "to read into [a] [z]oning [o]rdinance a restriction . . . that was never expressed nor intended").[25]

## 6. Trust & Township Approval

Finally, the Trust argues that the trial court erred in determining that the Easement does not require the Trust's or Township's pre-approval with regard to the location, development plan and construction of the Replacement House. The proposed location and proposed development run afoul of the preservation purposes of the Easement. The Replacement House must be located without disturbance to the "viewsheds" and the "scenic view" of the Property. Trust's Brief at 42. Because the Property is in the historic district, the Replacement House must be designed in keeping with the existing historic structures. Therefore, the Trust and the Township must be given authority to approve any development in advance to ensure that it does not run afoul of the preservation purposes of the Easement.

---

Baughman Farm and surrounding area. The Naylors sensitively renovated the neighboring eighteenth century house (Job Harvey's house), in which they live. *See* R.R. at 176a, 1049a-50a, 2507a. The Naylors also restored the historic barn on the Property. R.R. at 1860a-64a.

[25] We also note that such restrictions were not applied to the Mill Lot. The Agreement of Sale of the Mill Lot permitted the Township to construct structures "in connection with utilities, water pipes, driveway or parking lot, fences, restroom facilities or any structures physically connected to [t]he Mill, such as a bathroom" in conjunction with the Mill's restoration. R.R. at 60a.

The Trust also contends that the Naylors, by previously seeking the Trust's approval as to locations for the Replacement House and agreement to amend the Easement, are estopped from arguing otherwise in this appeal. The trial court erred by not giving their estoppel argument adequate consideration.

Contrary to the Trust's arguments, the Easement does not give the Trust or the Township any authority to approve or disapprove any improvements to the Baughman Farm. Rather, the Easement bestows the Trust with the right to enforce the Easement by virtue of the terms of the Easement itself. The Easement does not give the Township any enforcement rights. Specifically, the Easement provides:

> H. [The Trust] shall have the right to enter upon the [Baughman Farm] set forth herein to inspect for violations of the aforesaid provisions [of the Easement] to remove or eliminate any such violations; and to perform such restoration as may be deemed necessary to restore the land after removal of said violations. [The Trust] shall have the right to seek any legal action or remedy at law or in equity to enforce the provisions set forth herein and granted hereunder, including, without limitations, by the remedies of specific performance of injunction.
>
> I. Nothing herein shall be construed as a grant to the general public or to a person or persons other than [the Trust], its servants, successors or assigns or its duly authorized agents, of the right to enter upon the Property.
> . . . .

Easement at 14-15; R.R. at 1310a-11a.

Accordingly, the Trust may enter upon the Property to inspect for violations of the Easement's requirements and may file suit in order to enforce the Easement's terms. Nowhere in the Easement's language is the Trust vested with a preemptive gatekeeping role, a fact that renders meritless the Trust's argument that its assent is necessary for a residence to be constructed on the former Baughman

45

Farm.[26]  Rather, its duty is to monitor for violations and then seek legal remedies should what was once the Baughman Farm be developed in a manner the Trust believes violates the Easement.  Thus, the trial court properly concluded that the Trust does not have power under the terms of the Easement to approve or disapprove of the Naylors' Replacement House plans.

As for the Trust's estoppel argument, the doctrine of estoppel "recognizes that an informal promise implied by one's words, deeds, or representations[,] which leads another to rely justifiably thereon to his own injury or detriment, may be enforced in equity.  The two essential elements of equitable estoppel are inducement and justifiable reliance on that inducement." *Belleville v. David Cutler Group, Inc.*, 118 A.3d 1184, 1199 (Pa. Cmwlth. 2015) (citations omitted).  Further,

> [t]he inducement may be words or conduct and the acts that are induced may be by commission or forbearance provided that a change in condition results causing disadvantage to the one induced.  More important, the laws require that . . . [t]he representation or conduct must of itself have been sufficient to warrant the action of the party claiming the estoppel.

*Id.* (quoting *Zitelli v. Dermatology Education & Research Foundation*, 633 A.2d 134, 139 (Pa. 1993)) (emphasis omitted).  Equitable estoppel "arises when 'a party, by acts or representations intentionally or through culpable negligence, induces another to believe that certain facts exist and such other relies and acts on such belief, so that the latter will be prejudiced if the former is permitted to deny the existence of such facts.'" *Kuharchik Construction, Inc. v. Commonwealth*, 236 A.3d 122, 138

---

[26] We note that the Naylors restored the existing barn on the Property without any input or pre-approval from the Trust or Township.  *See* R.R. at 1207a, 1863a.

(Pa. Cmwlth. 2020) (quoting *Department of Revenue, Bureau of Sales and Use Tax v. King Crown Corp.*, 415 A.2d 927, 930 (Pa. Cmwlth. 1980)).

The fact that the Naylors previously sought the Trust's approval of locations and its agreement to amend the Easement does not trigger the doctrine of equitable estoppel. The Naylors took these steps in an effort to reach an amicable resolution with the Trust and to avoid the delay and expense of protracted litigation. Obviously, their efforts failed. However, in no way did their actions constitute a legally binding admission or estoppel that the Trust has pre-approval authority. The Trust has not asserted any prejudice. As the trial court aptly opined: "Obtaining such approval before building is merely expedient, as doing so would avert a later claim from the Trust that the location is inconsistent with the servitude." Trial Court Op., 1/12/18, at 14. To conclude otherwise would deter parties from attempting to settle their disputes without litigation. *See Hydrojet Services, Inc. v. Reading Area Water Authority*, 220 A.3d 1199, 1204 (Pa. Cmwlth. 2019) (strong judicial policy favoring the settlement of legal disputes). Thus, the trial court did not err in this regard.

## IV. Conclusion

For these reasons, we conclude that the trial court did not err in granting partial summary judgment in favor of the Naylors and declaring that the Naylors may construct a Replacement House on the Property at a location, style and configuration of their choosing so long as it does not violate the servitude of Easement, and that prior approval from the Trust or Township is not required under the Easement.

Accordingly, we affirm.

_____
MICHAEL H. WOJCIK, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Russell Naylor and              :
Suzanne Naylor, h/w            :
                                         :
                    v.           : No. 659 C.D. 2018
                                         :
Board of Supervisors of        :
Charlestown Township and French  :
and Pickering Creeks Conservation  :
Trust, Inc.                   :
                                       :
Appeal of: Board of Supervisors of  :
Charlestown Township        :

Russell Naylor and Suzanne    :
Naylor, h/w               :
                                       :
                    v.           : No. 707 C.D. 2018
                                       :
Board of Supervisors of         :
Charlestown Township and French  :
and Pickering Creeks Conservation  :
Trust, Inc.                   :
                                       :
Appeal of: French and Pickering  :
Creeks Conservation Trust, Inc.   :

# **O R D E R**

AND NOW, this 7th day of January, 2021, the judgment entered by the Court of Common Pleas of Chester County in favor of husband and wife Russell Naylor and Suzanne Naylor, on April 19, 2018, is AFFIRMED.

_____
MICHAEL H. WOJCIK, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Russell Naylor and Suzanne Naylor, :
h/w :
 :
 :
v. : No. 659 C.D. 2018
 :
Board of Supervisors of Charlestown :
Township and French and Pickering :
Creeks Conservation Trust, Inc. :
 :
 :
Appeal of: Board of Supervisors of :
Charlestown Township :

Russell Naylor and Suzanne Naylor, :
h/w :
 :
 :
v. : No. 707 C.D. 2018
 :
Board of Supervisors of Charlestown :
Township and French and Pickering :
Creeks Conservation Trust, Inc. :
 :
 :
Appeal of: French and Pickering :
Creeks Conservation Trust, Inc. : ARGUED: November 13, 2019

BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
          HONORABLE RENÉE COHN JUBELIRER, Judge
          HONORABLE PATRICIA A. McCULLOUGH, Judge
          HONORABLE ANNE E. COVEY, Judge
          HONORABLE MICHAEL H. WOJCIK, Judge
          HONORABLE CHRISTINE FIZZANO CANNON, Judge
          HONORABLE ELLEN CEISLER, Judge

OPINION NOT REPORTED

CONCURRING AND DISSENTING OPINION
BY JUDGE CEISLER                              FILED: January 7, 2021

       While I agree with much of the majority's reasoned opinion in this matter, I

vigorously dissent from their conclusion that the at-issue Easement does not bar

Russell and Suzanne Naylor from building their desired new residence.

When ruling upon a motion for summary judgment, the trial court must resolve all doubts against the movant, examining the record in the light most favorable to the non-moving party, and "may grant summary judgment only where the right to such a judgment is clear and free from doubt." *Fine v. Checcio*, 870 A.2d 850, 857 (Pa. 2005). Our review of an order granting summary judgment is limited to determining whether the trial court's decision constituted an abuse of discretion or an error of law. *Salerno v. LaBarr*, 632 A.2d 1002, 1003 (Pa. Cmwlth. 1993).

The General Assembly has expressly declared that the purpose of the Conservation and Preservation Easements Act (Easements Act)[1] is to "recognize[] the importance and significant public and economic benefit of conservation and preservation easements in its ongoing efforts to protect, conserve or manage the use of the natural, historic, agricultural, open space and scenic resources of this Commonwealth." Section 2 of the Easements Act, 32 P.S. § 5052. In keeping with this statement, the General Assembly has instructed the courts of this Commonwealth to interpret the language of conservation easements as follows: "Any general rule of construction to the contrary notwithstanding, conservation or preservation easements shall be liberally construed in favor of the grants contained therein to effect the purposes of those easements and the policy and purpose of [the Easements Act]." Section 5(c)(2) of the Easements Act, 32 P.S. § 5055(c)(2). This direction effectively modifies the general rule

> that the same rules of construction that apply to contracts are applicable in the construction of easement grants. . . . In ascertaining the scope of an easement, the intention of the parties must be advanced. . . . **Such intention of the parties is determined by a fair interpretation and construction of the grant and may be shown by the**

---

[1] Act of June 22, 2001, P.L. 390, 32 P.S. §§ 5051–5059.

> **words employed construed with reference to the attending circumstances known to the parties at the time the grant was made.**

*Zettlemoyer v. Transcon. Gas Pipeline Corp.*, 657 A.2d 920, 924 (Pa. 1995) (internal citations and some punctuation omitted, emphasis added). Consequentially, the Easements Act essentially requires courts to construe conservation easements in a far broader manner than other types of easements, in order to maximize the reach of their protective powers. Even so, when dealing with a conservation easement that went into force prior to the Easements Act's June 22, 2001 effective date, such as the one central to this matter, the Easements Act may not be retroactively applied thereto where doing so "contravenes the Constitution of the United States or laws of the United States or of this Commonwealth." Section 7(b) of the Easements Act, 32 P.S. § 5057(b). Thus, when considering such pre-Easements Act conservation easements, the plain meaning of the words used therein remains our touchstone in determining the purpose animating such easements.

Turning to the Easement at issue in this matter, it contains a number of sections that pertain to the state of the Baughman Farm, the Victorian House, and the owner's right to construct buildings. First, there are a group of prefatory whereas clauses, several of which are pertinent to the matter before us:

> WHEREAS, the Pickering Valley is still rural and relatively free from over-development and commercial or industrial intrusion and is of high scenic quality;

> WHEREAS, the [Baughman Farm] is partly in open tilled fields and pasture, partly wooded, partly grown up with trees and bushes which create fine wildlife and bird cover, with topography including some floodplain and some high water table or wet areas; and

> . . . .

> WHEREAS, the [Baughman Farm] lies in the area recommended for preservation in the Report [titled "Pickering Creek Valley: A Preservation Opportunity"] as

a Critical Environmental Preservation District, high in historic and cultural values, and also designated in the Report as possessing high scenic quality, and within a Scenic Corridor as designated by the Report; and

WHEREAS, the [Baughman Farm] is in Charlestown Township, which is noted for its scenic beauty and historic values; and

**WHEREAS, all the buildings on the [Baughman Farm] are on the National Register of Historic Places and are part of the Charlestown National Historic District; and**

**WHEREAS, one of each buildings is an historic water**[-**] powered mill, first used as a fulling mill and later a grist and cider mill and the dwelling house on the [Baughman Farm] is a classic example of Victorian architecture**; and

. . . .

WHEREAS, Grantor-Declarant [Mr. Bartschi] is desirous of preserving the agricultural, **historic**, **scenic** and relatively natural state of the [Baughman Farm] and further desires to conserve and protect the [Baughman Farm] and surrounding lands from soil erosion, water pollution, natural disruptions, visual intrusions and other occurrences which might interfere with the beauty and unique character of the [Baughman Farm] as it exists in its relatively natural, scenic, historic and agricultural state; and specifically to protect it and its environs and the lands and streams adjacent to it in the following ["]particulars[".]

Open Space Easement in Gross in Perpetuity and Declaration of Restrictive Covenants (Easement) at 2-4 (emphasis added); Reproduced Record (R.R.) at 30a-32a.

Of relevance here are the following "particulars":

II. <u>Scenic Enjoyment of the General Public</u>

The [Baughman Farm] is in full view from several well[-]traveled public roads one of which passes through it and bisects it and the others adjoin it or pass near it. The views from these public roads and from the lands open to the public which adjoin or lie

EC - 4

near the [Baughman Farm] give fine panoramas across the gently sloping fields, meadows and woodlands of the [Baughman Farm], across the Pickering Creek and looking upward across the lowlands and rising slopes to wooded ridges on the north, east and south of the [Baughman Farm] which are strong features of the local landscape. From all directions, the prospect is scenic and beautiful. In addition, the historic buildings on the [Baughman Farm] are most attractive examples of 19th century architecture of both wooden and stone construction.

III. Protection of the Natural Habitat or Ecosystem of Wildlife, Plants and Fish

(a) Wooded Area - Conservation or the wooded area in its natural state including both trees and the ecologically important varied undergrowth and plant life; as well as

(b) Wildlife - Protection of the wildlife of the area including deer, raccoon, foxes, other small animals, and bird life, both migratory and local; as well as

(c) Fish Life - Protection of fish in the Pickering [Creek] together with such aquatic or semi-aquatic mammals as muskrat and mink, and the many varieties of insect life which are indicative of the liminalogical health of the streams and which support the fish.

(d) The fields and pastures also provide feed for animals and birds and a relatively natural habitat.

IV. Public Recreation and Education

Pickering Creek affords recreational fishing to the general public. Members of the public driving on the public roads can get a charming view of a 19th century farm setting.

Easement at 5-7; R.R. at 33a-35a.

Later on in the Easement, Mr. Bartschi and French and Pickering Creeks Conservation Trust, Inc., stated that it is focused upon

EC - 5

**preserving the beauty and unique character of the [Baughman Farm], and its environs as they exist in their historic, scenic, agricultural and relatively natural state**, subject to the qualifications hereinafter set forth, and . . . conserving and protecting the [Baughman Farm] and surrounding lands from any natural disruptions or other occurrences which might interfere with the same, including, without limitation, soil erosion, water pollution and visual disruptions or intrusions in **or upon the general scene as viewed from the roads which pass nearby or run through the [Baughman Farm], or from surrounding public and protected areas.**

Easement at 10 (emphasis added); R.R. at 38a. To that end, Mr. Bartschi "agree[d] that the Property shall remain in its present relatively natural and scenic state subject to the qualifications hereinafter mentioned, and shall not be the subject of residential (except as hereinafter provided), industrial or commercial development (except farming)." Easement at 10 (emphasis added); R.R. at 38a. These "qualifications" included, in relevant part:

A. No industrial or commercial activities, with the exception of farming, or the operation of the aforesaid mill, shall be conducted or permitted on the [Baughman Farm];

B. **No new or additional buildings or structures (as hereinafter defined) shall be built and maintained on the [Baughman Farm]**.

C. For the purposes of this Grant and Declaration, the following definitions shall apply:

(1) "Farming" shall include the commercial production of any and all plant and animal products, including Christmas trees, and the breeding, raising, using, maintaining or sale of any livestock including horses, mules and donkeys.

(2) **"Building" and "structure" shall include the ordinary usage of the words**[,] as well as asphalt or concrete roads, driveways and parking lots, mobile homes, (meaning transportable dwellings intended for permanent or semi-permanent

occupancy or office or place of assembly, but not including recreational trailers), pipelines, drainage swales, poles, or any other facilities normally used in supplying utilities or removing effluent or surface water; **provided, however, that the restrictions in this [Easement] as to buildings and structures shall not apply to structures or facilities for the use or benefit of the general public or a portion thereof** *other than the Grantor-Declarant [Mr. Bartschi], Trust, and their or its respective heirs, devisees, executors, administrators, successors or assigns or any person holding by, through or under them or any of them*, which structures or facilities are acquired or constructed by the United States, the Commonwealth of Pennsylvania or any political subdivision or municipality thereof, or any other public agency having or performing governmental functions, or by any private or public corporation having or using the power of eminent domain whether such acquisition or construction shall be made under such power or by private treaty, other contract, or otherwise.

D. No signs, billboards or outdoor advertising structure shall be displayed on the [Baughman Farm] other than one sign not exceeding four feet by six feet for each of the following purposes: (i) to state the name of the [Baughman Farm] and the name and address of the occupant, (ii) to advertise an activity, permitted under the provisions of this [Easement], and (iii) to advertise the property for sale or rental. Provided, however, that . . . sub-paragraph F shall not limit the right of [the Trust] to display on the [Baughman Farm], at its discretion, a small marker or sign evidencing its interest under this [Easement], provided the same is approved by Grantor-Declarant in writing.
. . . .

G. The parties hereto further covenant and agree that the following uses and practices of and on the [Baughman Farm], though not an exhaustive recital of consistent uses and practices, are consistent with their intentions and in consonance with this [Easement]:
. . . .

(d) **Subject to all the limitations stated elsewhere in this [Easement,] to maintain and repair fences, buildings and other improvements on the [Baughman Farm] and to place upon the [Baughman Farm] those additional fences, buildings and other improvements as may be necessary for agricultural purposes, all in consonance with Paragraphs C and D above**[.]

Easement at 11-14 (emphasis added); R.R. at 39a-42a.

Several things are shown through this language. First, Mr. Bartschi wished to preserve the Baughman Farm *as it existed at the time* he signed the Easement with the Trust. Second, this desire encompasses the *historical and scenic* aspects of the Baughman Farm, including the Victorian House. Third, while the Easement does not allow new residences to be erected, it does permit maintenance and repair to be done on the Baughman Farm's non-agricultural buildings. Fourth, the Easement's development restrictions not only bound Mr. Bartschi, but are binding upon his successors-in-interest as well.

Therefore, given the unambiguous language of the Easement, it is evident the Court of Common Pleas of Chester County (Trial Court) erred in granting summary judgment to the Naylors, an error that the majority now compounds. Both the majority and the Trial Court have improperly ignored the Easement's language *expressly barring* the erection of new residential structures on the former Baughman Farm, a prohibition which clearly covers the Naylors' desired future dwelling. The majority has given its blessing to the Trial Court's erroneous interpretation of the Easement, thereby arming the Naylors with incredibly broad authority to erect a residence of *any size* and at *any location* on their Property, complete with any accoutrements they desire, "such as a detached garage, driveway, tennis court, swimming pool, shed and equipment enclosure, as well as septic, stormwater management, etc." Trial Ct. Decision, 1/12/18, at 16-17. The Naylors' ambitions,

thus unconstrained in spite of the Easement, will now be checked only by the strictures of the Township's various ordinances. Such unfettered latitude flies in the face of Mr. Bartschi's clear intent to preserve, in perpetuity, the Baughman Farm in substantially the same state as it existed at the time of the Easement's signing, as well as his clear intent to radically limit any attempts at further residential development thereon.

The majority focuses on the lack of explicit language meticulously placing limitations on the size, location, or appearance of a replacement to the Victorian House. *Naylor v. Bd. Of Supervisors of Charlestown Twp.*, (Pa. Cmwlth. Nos. 659 C.D. 2018 and 707 C.D. 2018, filed January 7, 2021) slip op. at 37-38, 42-43. This, however, misses the forest for the trees, given that the Naylors' proposed home would very obviously constitute new residential development. Furthermore, there is no doubt that the Easement would bar the Naylors from building their desired house if the Victorian House had been allowed to deteriorate to a dilapidated shell; how then is it logical to find that the Naylors effectively have carte blanche to build a new house of any size at a different location because the Victorian House instead went up in flames and had its remains then bulldozed?

Contrary to the majority's and the Trial Court's conclusion, the Easement only permits a residence to be located *upon the footprint of the original Victorian House*, due to the combined effect of the Easement's prohibition against the construction of new residences and its broad language regarding maintenance and repair; it *does not* create a free-floating right to build a larger home elsewhere on the former Baughman Farm. In other words, the Easement's overarching language is that the Victorian House may be rebuilt at its original location, but that is the extent of the leeway given by the Easement regarding residential use of the land which once constituted the Baughman Farm.

Furthermore, there is conflicting evidence in the record as to where exactly the Victorian House was located on the former Baughman Farm. At this point, it is not clear whether the Victorian House was entirely on the Naylor Property, entirely on the Mill Lot, or straddled the two. *See, e.g.*, Notes of Testimony, 5/23/17, at 74-75 (trial testimony of Pamela Brown); R.R. at 1298a-1336a (the Easement, pictures and maps of the Baughman Farm, agreements of sale for both the Mill Lot and Naylor Property, and related communications); Russell Naylor Dep. at 90-96; R.R. at 805a-11a. A remand is thus in order, so that the Trial Court can determine the Victorian House's exact location and, by extension, whether the right to rebuild it was transferred to the Naylors when they purchased that part of the Baughman Farm from the Bartschi Foundation. The majority disregards this critical point as well.

Consequently, I concur in part with and dissent in part from the majority's decision in this matter.

_____
ELLEN CEISLER, Judge

Judge Cohn Jubelirer joins in this Concurring and Dissenting Opinion.